And we'll hear argument next in United States v. Tanner and Davenport, 183598, 3601, 294, and 19356. Ms. Shapiro. May it please the Court, my name is Alexandra Shapiro, and I represent Andrew Davenport in this appeal. In Skilling v. United States, the Supreme Court cabined the honest services fraud to paradigmatic cases of bribes and kickbacks in order to avoid serious constitutional problems. And in that case, the Supreme Court also held that mere undisclosed self-dealing or undisclosed financial conflicts of interest are not honest services fraud. What does that mean, paradigmatic? I think that seems to be part of the core of this issue here. In Skilling, it was excluding pure self-dealing, but it left in bribes and kickbacks and the core of what was meant by that. And so I guess my question is, are there any contours to paradigms or core or the language that the Court used in that case? Well, I think that where one would look to find that core is in the cases that the Supreme Court referred to in the opinion, and they referred to a series of cases cited in the United States' brief in that case. And if you look and examine those cases, what they typically involve is in the commercial context, the situations where an individual is steering business to further his own undisclosed financial interest, such as to receive kickbacks of commissions for that business. So I think that's what we believe Skilling is referring to as a paradigmatic case. And the situation in this case is extremely unusual for a number of reasons. One of them is that Valiant, the alleged victim, was already steering business to Philidor well before Mr. Tanner had any interest. And indeed, it had invested money and put a number of employees, including Mr. Tanner, to work at Philidor and help it grow and directed them essentially to act in Philidor's best interests. And was there not evidence that notwithstanding everything that you said, Mr. Davenport and Mr. Tanner took it a step further? That is, there were undisclosed payments. And as a result of that, the evidence may show that Mr. Tanner provided information and engaged in certain conduct that was not in Valiant's interests but appeared to be in Philidor's interests. So not in his employer's interests, but in the interests of the person who was making these undisclosed payments. Well, certainly, viewing the evidence in the light most favorable to the government, as the Court must, we're not disputing that there was an undisclosed financial interest or that Mr. Tanner took acts that one could construe as helping Philidor. I think we have responses to those. Some of them my co-counsel will deal with in terms of evidence that wasn't admitted. But the very nature of an undisclosed financial interest is exactly that. That is to say, to the extent that one has an interest in another company and it may be in a particular case, and we think in most cases the interests were aligned, but to the extent the interests weren't aligned and Mr. Tanner did something he thought would benefit Philidor, that's not inconsistent with what you would think someone who merely had an undisclosed financial interest would do. There's a difference between Mr. Tanner purchasing 7.5 percent of the stock of Philidor, if it were traded on the open market, and being given that. The latter looks more like a bribe. Well, Your Honor, respectfully, I disagree. I think the evidence here is quite different from the types of cases in which this Court has found bribes like, you know, the Rosen case or the Garcia case. Sorry, not the Garcia. Ganim. Ganim. And some of the others cited where what you have in those cases, they're public officials, but there's a consulting arrangement and there's no work done. The only work that's done is, for example, steering government grants to the company or something like that. In this case, it's very different because it's undisputed and indisputable on the record here that Mr. Tanner was, you know, traveling every week across the country, spending all of his time working at Philidor's offices to benefit Philidor. So it may seem like the ultimate payment that he received after the transaction a year and a half later is a large amount, but he was working, you know, day in and day out to grow the Philidor company. It's not as if he was just, it was a no-show job and his only job was to be some kind of double agent or something. But isn't it right that at a certain point, at least that there was evidence, and I might be wrong about this, that Valiant wanted to develop relationships with other pharmacies so that it would be less dependent on Philidor? There is evidence that, and the government relies on an argument that Mr. Tanner was asked by his boss to try to develop relationships with other pharmacies. I believe there's evidence that we weren't allowed to admit to show that what happened there wasn't what it appears to be. But putting that aside, I think that still fits within the context of what I'm arguing here, which is that a person with an undisclosed financial interest might well take steps to conceal that financial interest, might well take steps in furtherance of that interest, even if they conflict with his employer's interest. But that's, by definition, what anyone with an undisclosed financial interest might well do and what Skilling very clearly rejects as honest services fraud. It may well violate company policies. But the question here is, is this a federal crime that can deprive someone of his liberty, or is it at best a breach of fiduciary duty, some type of civil claim that it could give rise to here? Is there a civil claim that Valiant has brought here? I'm not sure the answer to that. I believe, actually, the investigation here started as an investigation of Valiant for failing to disclose to its shareholders its interest in Philidor at the time of the sale. But I'm not sure perhaps my co-counsel would. May I ask you a question about the restitution? Yes. So I had a hard time understanding the argument relating to restitution. Take me through very briefly why you think that the restitution order was incorrect. Okay. We're only challenging eight million of it? Right. Just to be clear. First of all, what the district court said it was doing was ordering the defendants to pay restitution of the amount that the Two million of that, and the government's argument, and the district court adopted this, was that the price had increased from the initial offer by $8 million by the end. $125 to $133. Correct. And the first two million is just a mistake. And there's an e-mail in the record, which we cited in our papers, which makes clear that when Valiant came to Mr. Davenport purporting to represent their discussions and said $125, he wrote back and said it should be $127. Remember, that's what we discussed. So that's $2 million. The remaining $6 million, we believe there's simply that the government didn't carry its burden of proving that the difference is attributable to anything that Mr. Tanner did. There's no evidence in the record that Mr. Tanner was directly involved in any negotiations over the price. Go ahead. Davenport received information from Tanner during the negotiations. The value of that, I imagine, is hard to approximate what this precise impact is, but why isn't the difference a reasonable effort to get at that number? Because if you actually look at the evidence, it consists of the following. Things like there's an e-mail that Tanner sent to Davenport with a copy of the term sheet, and then Davenport actually received it the same day from Valiant. And there's no evidence in the record, the government can't, and the court, district court wasn't able to point to anything specific that changed as a result of any information. But there was evidence that he was receiving advice from Mr. Tanner throughout that period of time. Well, but there's no evidence that any term changed. And, indeed, the government relies heavily in its brief on an e-mail in which the government had stated in its brief that it said that Mr. Tanner was going to get concessions, when, in fact, if you look at the e-mail, it's Mr. Davenport who's sending the agreement to Mr. Tanner and saying, this is a typical, I think he uses a phrase, 800-pound gorilla, will get concessions where necessary. So Mr. Davenport is actually informing Mr. Tanner about what's going on with the negotiations. What are we to make, and I don't want to belabor this, but what are we to make of these e-mails where Mr. Davis, who's negotiating on behalf of Valiant, asks Mr. Tanner for his views because Mr. Davis thinks that these numbers are too high that are being proposed by Philidor. And Mr. Tanner says, no, no, no, they're actually good numbers. Well, if you look at that e-mail chain, I believe, and the version that's actually in our appendix has the response from Davis on the top. And what it indicates is that Mr. Davis forwards this to Tanner and says, what do you think of this? Tanner says, it seems about right. And then Mr. Davis actually responds and says, you're right, like I was making, there was a math error. And there's actually no evidence in the record whatsoever that Mr. Tanner ever provided any incorrect information to Mr. Davis when Mr. Davis asked him questions during the due diligence. So if I could just add one, I see my time is up, but I wanted to make one other point. You're well past your time, but make your last point. Regarding the restitution, the other point is that if you actually look at other evidence, and it's not our burden, obviously, it was the government's burden and they failed to carry it, but other evidence in the record demonstrates that the real reason that the price increased was, had to do with this, these milestone payments, which were based on estimates of EBIT, and as time progressed and they got further into the fourth quarter, the projections went up. Isn't it reasonable to think for a jury or for the judge, district court judge more importantly, to conclude that if Valiant had known that Mr. Tanner was giving it conflicted advice about the Philidor acquisition, it would have either heavily discounted the price that it paid or not engaged in the acquisition at all? So why isn't one way of looking at this that Mr. Davenport and Mr. Tanner actually got a $125 million restitution break? Well, I think that's... Because the government did propose that the restitution amount be, I think, $133 million, which was rejected. But that is one way of looking at this. I suppose, but I don't think that that's a bit counterfactual given that the economics of it really were that Valiant had built the company up and it had a financial interest in acquiring the option, and that's really what was going on. Thank you very much, and I think you've reserved some time for rebuttal. We'll hear from Mr. Volchuk. May it please the Court, Daniel Volchuk for Gary Tanner. Judge Park, Valiant has not brought a civil claim against either defendant. A series of erroneous evidentiary rulings here left the jury with a highly distorted picture regarding the key issue at trial. I'd like to begin by explaining why the government has not carried its burden to show that the errors were harmless. Put simply, the errors were not harmless because the excluded evidence was directly responsive to the government's central arguments on the key issue at trial. The key issue at trial was whether the defendants had the specific intent to defraud Valiant pursuant to a quid pro quo agreement. To show that, the government sought to prove that Tanner acted contrary to Valiant's interests. That was really the crux of it. The government tried to throw in a trial and tries to throw in again here on appeal all sorts of other things, most of which fall under the umbrella of undisclosed self-dealing. We know from Skilling that that, as a matter of law, is not honest services fraud. That's just a bright line Supreme Court drew. So the government's evidence of undisclosed self-dealing, and I'm talking here about payments from Davenport to Tanner, deception, concealment, conflicts of interest, undisclosed self-dealing. All that evidence could get the government up to that bright line, which we know is short of a conviction and hence short of overwhelming evidence of a conviction. To get over that line, it had to show something more. And again, it was Tanner acting contrary to Valiant's interests. Two of the government's leading points on that were negotiation of the option agreement and what came to be called diversification. I'd like to go through each of them, but as to each, critical defense evidence was excluded. Starting with the option agreement, the government told the jurors that they should infer specific intent to defraud from the supposed fact that during negotiation of the option agreement, Tanner acted contrary to Valiant's interests. In fact, the prosecutor told the jury in closing arguments that that alone was enough to convict. That's page A472. So a key government argument. And the defense sought to answer it by introducing an e-mail in which Tanner acted to protect Valiant's interests by advising Valiant's negotiator to include in the agreement a penalty provision, a provision more protective of Valiant's interests than what was actually agreed to. That was excluded, and the government here makes no argument that that exclusion was correct. The header to that section of its brief, it's page 80, just says any error in excluding the e-mail was harmless. So they're conceding that error. And had that evidence come in, the jury would have had a significantly different picture regarding this key prosecution argument. And the evidence on that argument was thin to begin with. You look at page 13 of their brief, and they catalog what they had. Ms. Shapiro started with number one, page A580, the e-mail in which the government twice tells the court that Tanner said to Davenport, we'll get concessions where needed, when in fact it was the other way around. Davenport was saying, I'll get concessions for Valiant. So if anything, that e-mail showed Tanner acting to protect Valiant's interests, not contrary to it. The second thing they say is Tanner advised Mr. Davis, the negotiator at Valiant, without telling him that he had this ownership interest. That's the second thing they list on page 13. That is undisclosed self-dealing. So that is not acting contrary to Valiant's interests in any way, save the way the Supreme Court specifically said in Skilling, is not enough to constitute honest services abroad. So what about Tanner's role in trying to get the, in seeking to influence the discount at which Philidor would get the drugs from Valiant? Two responses, Judge Jacobs. The second one is going to be more direct, but I think the first one is more important. I am making a harmlessness argument. I am not making a sufficiency challenge. So if they have some evidence that a jury could accept that there was no excluded evidence regarding, that by itself is not enough. You look at the Sean Stewart case from last year. We cited it in our opening brief. Key evidence was excluded answering the government's intent argument. The dissent cataloged eight other points that the dissenting judge said were sufficient to show intent. And the majority said, in light of what was excluded, it was important evidence and it was directly responsive. The jury might have reached a different conclusion. So that's my first answer to your question, Judge Jacobs. Your argument is that it was a close call. So this is a close call. That's your argument. My argument is if the excluded evidence had come in, the jury would not, that the government cannot convince the court it is highly probable. That is the key language from this court's precedent. Highly probable that they still would have found intent to defraud. As I said, they told them just the purchase option agreement was enough. We don't know if the jury agreed with that. Convicted just based on that. Judge Jacobs, I want to get to the second answer to your question, the more direct response. This was, you look at the email. It's page A510 in the appendix. It's an exchange between Tanner and Davenport. And Tanner sends him a draft of the discount agreement. Davenport writes back and says, I thought we were going to do 4%. What about, you know, I can live with whatever you do. And Tanner says, I think we can get to 4%. This is somebody who at that time, this is before he'd gotten any instructions about diversification, which I still hope to get to. This was someone who was under direct instructions from his supervisors, build up Philidor. And he knew the CEO of his company, Valiant, had given Philidor a $2 million advance on fees. So this was in the vein of that. This was somebody who was thinking, we're trying to establish a long-term relationship with a partner. And it doesn't make sense to try to milk every last dollar. We want to build a good relationship. And to be clear, Judge Jacobs, even with the 4%, and there's evidence on this in the record, I think it's 1696 in the appendix, even the 4% was a better deal for Valiant than it had with other distributors. So it's not like Tanner was in any sense giving away the store. But the first answer, as I said, I think is the more important one. I do want to talk, if I may, about diversification. This was the government's other pillar on intent. And it was the argument that Tanner supposedly acted contrary to Valiant's interest by disregarding his boss's instructions to mitigate payor risk, a certain type of risk, by entering into relationships with pharmacies other than Philidor. The defense, to be clear, let's step back. Everyone agreed that Tanner initially looked into diversification, did some initial due diligence, that's A-565 in the appendix, and told his bosses about it, cited on page 9 of the government's brief. The question for the jury was, why didn't he finish going down that path? The government's answer, which the district court allowed it to present to the jury at length, was that because of the fraud. He was trying to defraud Valiant and mislead him. That was the government's answer. The defense had a two-part response. Number one, his initial due diligence, Tanner's, led him to believe that diversification was not a viable option for Philidor, for Valiant. There were no other good partners. And number two, he pursued an alternate strategy, known as hub and spoke, to mitigate payor risk. Three rulings by the district court prevented the defense from putting in that answer, the exclusion of Michael Hess. But Warren Waxer did testify that he discussed the hub and spoke option with Tanner. There was one answer that was given. Did you mention the possibility? And he said yes. There were dozens of other questions, or many other questions, I shouldn't say dozens, that were objected to. There was so much more to the story. The real issue was, why did the record show that after approximately April 2014, no more instructions were forthcoming to Tanner to continue down the diversification path? Was it because Cornwasser had come to believe what Tanner believed, which was that diversification was not an option? We were not allowed to explore that. We were not allowed to explore what else Cornwasser knew or didn't know and when he knew it. This was the government's star witness. And we were not allowed to cross-examine him about the topics he had addressed on direct examination. So okay, we come in and say we'll put in our witnesses instead. Michael Hess would have fully answered the government's diversification argument. He was not allowed to do so. He was kept out on relevance grounds, even though he was going to address precisely the same things that Cornwasser had addressed. And think about that for just a moment, Your Honor. As I said, this was one of the government's key pillars on intent, the crucial issue at trial. We were not allowed to cross-examine the government's star witness fully, and we were not allowed to put in our own witnesses. What else does a party do to put its case before the jury? That's how you do it. We were not allowed to do it, and that is why the errors are not harmless. Unless the Court has additional questions, we'll ask to reverse the judgments. Thank you very much, Mr. Cooper. May it please the Court, I'm Assistant United States Attorney Richard Cooper. I represent the United States below and here on appeal. I'd like to go first to Judge Park's question that kicked off the argument about what is paradigmatic in light of skilling. And I believe the answer can be found in this Court's en banc opinion in Rybicki, which did precede skilling but discussed what is a bribing kickback case and what is separately an undisclosed conflict of interest. And in Rybicki, this Court, in describing a bribing kickback case, talked about a case where a defendant has or seeks a business relationship with a victim and makes a secret payment in exchange for favored treatment. And that is precisely what happened here. So in terms of the paradigmatic bribing kickback case, it's the presence of a third party, as the Supreme Court noted in skilling and as this Court noted in Rybicki, that distinguishes a bribing kickback case on one hand from an undisclosed self-dealing case on the other hand. In fact, in skilling, the Supreme Court noted that there the government did not allege at any time that skilling solicited a side payment from a third party in exchange for making a misrepresentation. That's precisely what the government— —of the post-skilling cases, right? Yes, Your Honor. It's the presence of that third party. Now, Ms. Shapiro in her argument writes Andrew Davenport out of the equation by describing how Tanner received or acquired some type of interest. It wasn't, as Judge Jacobs noted, something where he went out and he purchased an interest in Philidor. This was given to Tanner by Andrew Davenport. So Davenport was the third party here, and that places this case squarely within the paradigmatic bribing kickback case. So is the government's position that that arrangement or agreement was part of the bribe, or is it something else? Because it seems to me the defendant's position is that if it wasn't part of the bribe, then it's just the payment of $9.7 million the next year was fulfillment of an agreement and not a paradigmatic kickback. So which is it? It was certainly that the government's position always has been that it was part of the quo, which is the thing of value under the statute that was given by Davenport to Tanner. The agreement, the 7.5 percent interest, not the money. Because the way I read the record, I didn't see that in the record, that the government's emphasis at trial was the $10 million. Am I missing something? There are two responses to that, Your Honor, one factual and one legal. I'll start with the factual answer, which is that it was part of the illegal agreement, that there was scant evidence there was actually a real financial interest. Indeed, Tanner's CPA, who testified at trial, testified that he had asked repeatedly to get any sort of agreements or contracts evidencing this alleged ownership agreement, and that the CPA, the tax preparer, was rebuffed by Gary Tanner at every step. That's first. Second, factually, there was a schedule of owners of Philidor that was provided to Valiant during the due diligence phase. Neither Tanner nor his shell company was reflected on that schedule. And third, Your Honor, Tanner, and there was testimony about this, never provided his tax preparer with a K-1 tax return, a K-1 partnership statement to reflect the legitimacy of his interest. What defense relies on, now I should note for the first time on appeal, this was never their argument below. They had always argued it was a gift. But now they argue on appeal that it was a self-serving statement by Tanner to his financial advisor to explain where this new money was coming from that was the basis for that ownership interest argument. But if I could get to the legal response also, under this Court's precedent, thing of value is widely construed. It means anything of value. And, in fact, in the Middleman's case from 2000 that this Court decided, that was a bribe and kickback case, the thing of value there was an undisclosed 12 percent ownership interest in the briber's company. So this Court has never decided which type, has never said that that type of benefit or thing of value is outside the ambit of 1346. Indeed, it's decided that it's squarely within the ambit of 1346. 7.5 percent interest. Is that a bribe or a kickback? Your Honor, the two terms were used interchangeably at trial by defense. Yeah, but what does it mean that we don't know what it is? Well, certainly the promise of the payment in advance of actually making the payment would be the bribe, and the kickback is the payment of the money after the fact. As this Court noted in Rosen, the crux of the quid pro quo is receipt of a benefit in exchange for an act the defendant performed or promised to perform. So either one qualifies under the statute as the quid in a quid pro quo. If I could respond. You're relying on the 7.5 percent stake, the $1,000 meal, hotel, and the $9.7 or $10 million amount after the fact. Yes, Your Honor. Those were all. That's it. Those were the quids. And under Ganem, a stream of benefits is perfectly. The indictment, I think, refers to an approximately $10 million kickback, and it doesn't mention the membership interest or the equity stake in the company. And they strike me as different things conceptually, and I guess it goes to Judge Jacob's question. One was money coming at the tail end of something, and the other is a promise. And so I guess I'm still not clear what the government's position is as to what the quid pro quo was. Our position was that those are really two sides of the same event. In other words, it would be illogical that after the fact Gary Tanner woke up one day and Andrew Davenport had given him $9.7 million, but that the promise to do so arose earlier. And the evidence from which the jury could have inferred the promise had arisen earlier includes, among other things, evidence that Gary Tanner had taken actions in Andrew Davenport's interest and against Valiant's interest as early as the summer of 2013, a year and a half before the payment was made, when Tanner secured more favorable payment terms for Davenport than Davenport was willing to pay, and that Tanner didn't disclose that to his supervisor, Laser Cornwasser, who testified at trial. He would have wanted to know that, and he expected his employees and the people who reported to him to describe to him accurately and faithfully the other side's negotiating position. That's something Gary Tanner didn't do. Instead, the evidence showed that he altered the arrangement to reflect a more favorable discount to Andrew Davenport, and then that was approved. And that, Your Honor, was a year. Just to answer Judge Park's question, does it matter that the indictment does not contain any reference to the 7.5% stake? No, Your Honor. It doesn't matter because the indictment described that as one of the means of the conspiracy. And in addition, the government did not argue below that this was a legitimate ownership stake, that it was evidenced by any kind of writing or document or contract, but this was a secret, illegal promise to pay a bribe and kickback. And then it was paid. Bribe or kickback. Yes, Your Honor. Not bribe and kickback. Bribe or kickback. Correct. So unless the court has questions on that piece, I'd like to turn it. Tanner's counsel has argued that the court excluded quite a bit of evidence suggesting that Tanner took acts that were detrimental to Philidor and could be construed as loyal to Valiant. And one of them is the, is a suggestion that the, the option agreement contain a penalty provision that would operate against Philidor. What was the basis for excluding that? And why would that be unimportant or uninfluential in the jury's consideration of whether Tanner was, was a fifth column or an agent for Philidor? So Your Honor, I have two responses to that. Perhaps I can begin with the harmlessness argument and then return to why it was properly excluded. In terms of harmlessness. First, the government never argued that Gary Tanner engaged in ceaseless unending criminal conduct and that every act he took while at Valiant was against his employer's interests. You objected when, when evidence was offered suggesting that, that he was loyal. Well, that the, the objection was, was based on the infirmity of that evidence as being hearsay evidence offered to prove the truth of the matter. How was it hearsay? Well, Your Honor, it contained in, in order to get to the purpose that the defense said it stood for, which was Gary Tanner's faithful existence as a Valiant employee. There were factual statements in that email like certain statistics for the purchase option agreement and how Tanner asserted Valiant should calculate the value of the purchase option agreement. Was it being offered for that? Or was it being offered instead to suggest that he was making a proposal that was disadvantageous to Philidor and, uh, with, with whom he was supposedly in codes and, uh, reflecting a loyalty to his employer. It's the disadvantageous nature, the part of, of your Honor's question that requires precisely, Your Honor, that requires an acceptance of the truth of the contents of the email. If I could just, The penalty provision is unambiguously disadvantageous to whoever has to pay the penalty. And that, Your Honor, is precisely the truth content of the email. Um, but in, in terms of, of harmlessness, if, if I may, um, there was ample testimony about Gary Tanner's involvement in the due diligence process on behalf of Valiant. I'd refer the court to the transcript at 645 to 646 and 677 to 682, which was testimony about how involved Gary Tanner was in the due diligence process and how Andrew Davis, the lead negotiator certainly believed that Tanner was acting in Valiant's interest. So there was ample evidence in the record from which the defense could have made the argument that they now claim they were barred from doing by, by virtue of the sustained objection to that one particular piece of evidence. Uh, furthermore, that evidence and that argument is more in line of the other good acts type of argument that this court has regularly, uh, affirmed objections to. Like I said, the government's argument was never that every act Tanner took was against Valiant's interest. Indeed, we conceded that there, that he was a hardworking employee who got up and flew across the country to go to work many weeks. Um, and that hard work or loafing off from work on occasion was not what the crux of this crime was, wasn't even part of this crime. So on one hand, it wasn't the government's theory, but also there was ample evidence from which the defense could have made that argument, including those transcript pages I cited to your honor. Um, on judge lawyers, restitution questions. If, if I can turn to that, um, a couple of responses to me, I want to ask you a couple of questions about forfeiture, but go ahead. Certainly your honor, which would you like me to begin with? Start with however you want to start. All right. So we'll end with forfeiture. Understood. Um, on restitution first, uh, we're here on an abusive discretion standard. So the question is based on the evidence that judge Prescott had before her, whether her, her ruling that the $8 million increase in the purchase price of the option was a harm to valiant resulting from this offense, whether that was an abusive discretion. It has to reflect a sound methodology, right? That's correct. Your honor. And can you explain what that methodology was and why that sound? So, um, I, I can, um, so let me begin there. Then the, uh, the inflation of the purchase price by $8 million was, uh, was a result of a negotiation process that was infected by the defendants secret scheme. And that's shown in a couple of, uh, uh, trial documents that judge Prescott had before her and that were in the record early on in the option negotiation process. Assuming you're right, that the process was infected. Does that just then allow the entire amount of the difference to, to be the methodology itself? I mean, that doesn't seem to be a methodology to me that just seems to be it's infected. And therefore the, you just take the difference and that doesn't reflect any kind of, um, attempt to, uh, to approximate what the impact of this infection was on, um, the company. I, I, I don't think that there's a methodology that could allow the district court to get there, but here there's more because there was a particular type of secret assistance that Tanner was providing to Davenport that shows that the process was infected. And before getting to a few exhibits, I would note that, um, there would be a basis to hold that the entire 133 million was loss or even that the $9.7 million that Andrew Davenport so willingly parted with after receiving payment from Valiant would be considered loss or could be considered loss. It doesn't mean that 9.7 much, because now you're saying if it could be 8 million or 133 million, what kind of, uh, sound methodology could produce this kind of wild swing in terms of valuation? Well, let me describe what judge Prescott found, which was not a wild swing. Judge Prescott rejected the argument that, that 133 would be an appropriate measure of loss. So let me focus on the $8 million wise to do so. So your honor on the $8 million, the evidence shows that the assistance that Tanner was providing to Davenport, um, dealt with and reflected, um, the rise in purchase price. So if I can just walk the court through a couple of particular documents that illustrate this point on, uh, October 27th, uh, of 2014, that's when Valiant communicated the option, uh, the letter of intent, uh, to Andrew Davenport that included a $125 million purchase price. $100 million upfront and a $25 million, uh, milestone payment. That's the appendix at 574. And we know that that is the initial amount that Valiant considered and not the, uh, this $2 million difference that Ms. Shapiro pointed to, because on the same day, this is the appendix at 2074. Um, Valiant had a board presentation, a board deck that reflected that $125 million price. So we know this was not a mere Scrivener's error and that Andrew Davis somehow made a mistake and wrote down $2 million or less than the parties had agreed to. So that's October 27th. Later that same day on October 27th, Andrew Davenport sent to Gary Tanner and only to Gary Tanner, a proposed response to that initial offer from Valiant, including proposed language, pushing back and trying to get the price raised by $2 million. And where is that? And that is the appendix at 1478. And what Davenport, but by the way, your honor Davenport sent that to Gary Tanner's Brian Wilson email account was the, the alias, right? Correct. And at the top of that email, after laying out what Davenport's proposed response was to Valiant, Davenport wrote, what do you think as evidence from which judge Prescott certainly was entitled to, to infer that the two were just, in fact, it's direct evidence. I should say that the two were discussing Davenport's proposed pushback and Davenport's attempt to get the purchase price higher. That was October 27th. Why, why would somebody need to be corrupted in order to seek a better deal? Argument is that Gary Tanner was corrupted. Tanner was representing Valiant's interests and Valiant side of the table. And here we have Tanner. We have Valiant making an initial proposal. We have Andrew Davenport, who's supposed to be on the other side of the negotiating table, previewing arguments and trying to get a better foot forward against Valiant was no evidence of, um, Mr. Tanner's response to this email. Was there, there was not your honor. There was not. Um, but there is, this is evidence. I mean, for what it's worth of, um, a, uh, correspondence about this $2 million difference before Mr. Davenport then says, I think you made a mistake to Mr. S to Mr. Smith Davis, your honor. But yes, Mr. Davis, that's absolutely right. And in fact, over a week passes then until November 5th. And that's an appendix at six 54 where Andrew Davis writes back and increases the purchase price by $2 million. So if there's, if this was truly a Scrivener's error that they had agreed on something and Andrew Davis just wrote it down wrong, uh, the judge was certainly within her discretion to look at that eight day or nine day gap and all the emails that occurred in between. Um, and, and take from that, that Tanner's influence on the process assisted Davenport in raising the purchase price by $2 million. But there were also other emails in that interim period of time between Davenport and Gary Tanner's, Brian Wilson email alias, including Davenport's, uh, uh, email at appendix five 80, where Davenport writes about the letter of intent. He calls it a typical one sided, 800 pound gorilla agreement. We'll get concessions where needed. In order, in order for this, for there to be some kind of sound methodology, wouldn't the court have had to make some finding as to what, what the correct or the fair market value of Philidor was. Your honor that, that could have wanted to know that, um, that, uh, that they suffered a loss. That, that certainly could have been one way of getting to loss, but this was another way that judge Prescott adopted. And the question is whether she was within her discretion in adopting this method, where you have a scheme, a criminal scheme that was targeted at, among other things, Tanner secretly giving Davenport advice on getting a better deal from Tanner's own employer without telling Andrew Davis what was going on. Andrew Davis, valiantly negotiate objection to this $2 million increase before just Prescott.   Your honor, it's been argued for the first time on appeal here, this particular $2 million issue. Of course, defense objected to the imposition of restitution and argued that it was zero loss, but this $2 million issue arises for the first time on appeal. Would you turn to forfeiture please? Because I'm having a hard time understanding why it should be, uh, 19.4 million, as opposed to 9.7. It was only $9.7 million for each defendant. Your honor. Shouldn't it be jointly in several, shouldn't they be jointly in several liable? No. Under the forfeiture statute, um, uh, it's, it's not joined in several. Uh, it's the, uh, the proceeds under nine 81 that each, the proceeds of the offense that each defendant obtained or under nine 82 for the money laundering. And by the way, the court can affirm under either statute, nine 81 or nine 82 under nine 82, to which there was no objection. So it's reviewed here on plain error. Um, though it can't be both. Isn't that right? It, it can be both your honor. There, there can be a money laundering scheme that involves, I'm sorry, I'm still talking about the, um, uh, the, the, the joint severable part of it. Didn't, didn't Honeycutt and Honeycutt didn't Supreme court hold that you can't get both. But Honeycutt is about the same amount from both. Your honor. Honeycutt is about the legal doctrine of joint and several liability in a conspiracy context. Where, where one co-conspirator never acquires or obtains proceeds of a crime that are, that, that another co-conspirator obtains it's, uh, you know, for example, where there's a drug mule was part of a larger drug conspiracy who only has a small piece of the overall pie. That's not the case here. Um, Honeycutt also says, look to the statute and the relevant statutes, nine 81 and nine 82. And the substitute assets provision eight 53 P say that if a defendant acquires and then dissipates assets, there's still liable and forfeiture for the amount that they had acquired. So joint and several, uh, that that was not the basis for the imposition of the separate forfeiture judgments, the $9.7 million forfeiture judgments for each defendant set a ceiling on what the government can, uh, can obtain from the defendants in total. So it may in the end, uh, in certain circumstances operate similar to how joint and several liability is, is there not, I'm sorry. They were each ordered to forfeit $9.7 million. Is that correct? That's correct. So there was a possibility that, uh, there will be a total of $19.4 million in ordered forfeiture. Is there not? There's actually not your honor. And if, if I can just explain, take me through that. Thank you. So, um, the forfeiture orders don't operate as money judgments where the government can take them, go out and levy against individual assets. The government has to bring a substitute assets motion in court using the, the forfeiture judgments to, to levy against the defendants assets in connection with that subsequent forfeiture litigation. It is a defense that, that these defendants can raise to say that some portion of the 9.7 has already been paid. So the government cannot double collect there's the 9.7 sets of ceiling. Isn't it a better, I mean, as an administrative matter, isn't the better course to then, I mean, you seem to acknowledge that they will not be asked to, uh, pay or forfeit more than $9.7 million. Uh, total isn't the better administrative approach to, um, order that they be jointly and severally liable forfeiture for $9.7 million. I can't speak to, to which administrative approach would be best. Uh, the, the question for this court, I believe is whether it was plain error for the judge to have done what she did. And certainly, well, the question for me seems like you're, I mean, it appears that your, your answer is trust the government. We're going to, we're not going to, we're not going to, we're going to make sure that, uh, each defendant is liable for no more than nine point. Well, that together they're liable for no more than $9.7 million. My answer is a bit different than that, your honor, which is that in any attempt to collect on the forfeiture judgments, the government would have to bring an action in court. And it's a defense for the defendants to claim that some portion of that 9.7 has been paid by the other defendants. So in that litigated context, it's, it's a defense that they can raise. So the government won't be able to, to, um, obtain more than the 9.7 in total in forfeiture from these two defendants. So they have to go through another litigation. The, the government would have to bring a litigation in order to, in order to take the defendant's assets. They would have to go through another litigation in order to avoid paying 19 and change. Um, if they wanted to raise that as a defense, your honor. Why wouldn't they? Well, your honor, I, I would also note, um, one of the, the, the, uh, parts of honey, the points of honey cut is that we have to look to the forfeiture statutes and under the forfeiture statutes here, there is no provision for apportionment of liability in forfeiture. And so following the rule of, of honey cut, um, the, the district court should not look to try to apportion forfeiture liability and determine who was a certain percent liable and who was the remainder liable and, and issue forfeiture judgments in those amounts. Under 982, an issue arises as to whether Mr. Davenport is a mere intermediary. What is a mere intermediary? And is he one? So your honor, Mr. Davenport is not a mere intermediary for a few reasons. First, he engaged in four transactions that were part of the money laundering chain here, as we argue in our brief and is evidenced at special appendix pages, 65 and 66. And those four transactions, that doesn't mean he's, that he is or is not. It just means that it's irrelevant because it would be, he engaged in four transactions. So even if he was a mere intermediary, the forfeiture could occur anyway. Um, that that's right, your honor. So in one sense, the court doesn't even have to get to the question because he did engage in four transactions, but even still, uh, the definition of intermediary in the statute or in the case law is one who handled, but not retain the funds, um, that were involved in the, in the offense. So, and, and here, speaking of Mr. Davenport, he handled them, but did he retain them? He, uh, yes, your honor. So there, there are a couple of responses to that. First is the mere intermediaries intended for a party who is merely a pass through, as opposed to a participant in the criminal, a co-equal participant in the criminal scheme, which Andrew Davenport was here. He was not a mere intermediary. He was one of the two people who engage in this conspiracy. So that alone, I'm just going on your definition that he passed it through and didn't hold it. Didn't keep it. Well, your honor, he also, I think there, there is a, um, a logical argument that he would not, not have parted with the $9.7 million. So willingly, if he had not obtained at least $9.7 million worth of value and worth of benefit. And so that's, that's a basis on which you could consider the $9.7 million to be his gain as well. Thank you. Thank you. Thank you. Your honors. Ms. Shapiro. Just, just to your honors, just a few quick points. Um, with regard to the forfeiture, just to be clear, um, number one, the objection to the four forfeiture was preserved, um, at appendix 2130 to 31. Uh, it's clear from the defense submission that the argument was that Mr. Davenport didn't receive any proceeds traceable to the offenses and that he didn't cite either provision and, uh, nor did the government and its submission make a specific argument about 982. So that is plainly enough to preserve the objection with respect to the, uh, the transactions for 982. Um, the two of the transactions were merely, uh, Mr. Davenport transferring from his limited partnership and game LP, which held the interest in, uh, Philidor, uh, the money to his LLC, which is the shell companies. Exactly. And so at most, all that would count would be the two separate transfers from the LLC to Mr. Tanner's company with respect to restitution. Um, just quickly, I think my adversary, uh, pointed to an email from Mr. Davenport to the Brian Wilson address, uh, which contains a reference to, um, the, it says, what do you think? And then there's a sentence that talks about the total amount being 127 million. This is 1478. 1478. And you're one of your honors. I believe it was judge Lohier asked, well, does there any evidence of a response by Mr. Tanner? And we don't have a document, but we do have the email that Mr. Davenport in fact sent to Valley. And, and that's a page a five 78, which is sent on the same day. Um, and you will see that there is no change whatsoever to that language. Um, and there's no other indication that Mr. Tanner had any influence on Mr. Davenport, um, in making the points that he made to, to Valiant in that regard. The one other thing I wanted to mention about restitution quickly was your honor asked, well, didn't the government, uh, ask for restitution of the entire amount. And I misspoke. And in fact, that's not the case. And if you look at appendix two, two, eight, six footnote one, which is the order below, um, it makes clear that the government, uh, had requested 15 million and change. And so the disputed 8 million is, is really what we're talking about. The government never suggested that, uh, Valiant would be entitled to the entire purchase price. Um, lastly, with respect to the underlying merits of the case, um, uh, my adversary said, um, that there's evidence here of a solicitation of a side payment and that's a paradigmatic bribe or kickback. In fact, the, the heart of our argument here is that there's insufficient evidence of the pro and that the government is relying entirely on evidence of acts and evidence of non-disclosure of the interest. And our point is that particularly in the bizarre context of this case under skilling, the court should rigorously scrutinize the sufficiency of evidence of an actual exchange and agreement that the acts were being done in, in respect, uh, of the, the benefit that's being conferred. I mean, an agreement between Mr. Davenport and Mr. Tanner. There has to be real evidence that there was such an agreement. The last thing, and I, I see my time is running out, but I do want to emphasize, um, and Judge Park raised a question about this, that if you look at the indictment, um, there are multiple paragraphs, five, seven, eight, B, nine, 10, 11, uh, 13, 16, and 18, in which the focus is on, um, the alleged $10 million payment, uh, that comes at the end after the sale. There's only one reference to the interest that was conferred, which is a passing reference at paragraph eight B, noting that the financial advisor sent an email about establishing a legal entity to house that interest. Um, your honors, uh, unless there are any other questions, we'll rest on our papers. We ask that the judgment be reversed. Thank you very much. Thank you, your honors. Mr. Cooper seemed, Mr. Cooper seemed to say that we are within the paradigm of scaling because of the $10 million payment. We know that's wrong. That is undisclosed self-dealing. An agreement is not enough. There can be an agreement between Tanner and Davenport for Tanner to do things in valiance and Philidor's interest in exchange for a payment that is undisclosed self-dealing. We know that is not honest services fraud. The key is what makes what gets you within the paradigm. Judge Park is specific intent to defraud. That's why I said that is the key. And on that, the government's evidence was weak. Let me talk, if I can, about the three and a half versus 4%. Mr. Cooper repeated a misstatement that is in their brief on page 11, laser Cornwasser did not testify that he expected Tanner to tell him what the other side had or what the other side's position was. They cite a three 21. You can look at it. He does not say that that is a key point. It's another brick in the wall of our argument that their evidence was weak. And, and, um, judge Jacobs, I misspoke earlier, the page, uh, where you see that this deal was better for Valiant than the, that is the 4% than the deal Valiant had with others was a 1439. Now on the negotiation option email, the government made no argument in its brief. Like you heard this morning about why that exclusion was correct. I submit it's waived in any event, the email certainly should have come in. It was not hearsay. And if it was, it came in under the state of mind, exception, the easiest evidence, the strongest evidence of that is the language that district court used in excluding it. She said a two 87, the email quote is clearly being offered for the truth of its contents, particularly the intent of Tanner. That's exactly right. And that's why it should have come in at least under the state of mind exception. And your honor, I don't understand the government's argument that this is good acts evidence that was never argued below. It was not the basis for exclusion. It was never argued in their brief because it wasn't, we were trying to negate their evidence on the element of intent. They sought to prove intent by saying he acted contrary to valiance interest. All of the excluded evidence went to show that he acted to protect valiance interest. You didn't hear anything from Mr. Cooper this morning about diversification. That alone is enough to reverse. Mr. Hess was going to be our star witness. We didn't put on any witnesses. The two witnesses we were ready to put on Michael Hess and Alison Pritchett both couldn't get on because of rulings that we are now challenging. So there's no way to say these exclusions were harmless. The last argument I would make, and I said it in the topside argument, this is harmlessness. It's not sufficiency. It's not enough to say there's something the jury could have grabbed, grabbed, grabbed onto. There's something the jury could have believed. It's not enough to say they might not have believed Michael Hess. They might not have believed Alison Pritchett. They might have believed Cornwall. Sir. That there is not, I mean, you're contesting this notion that is being advanced by the government, that there's overwhelming evidence that he acted in a way that was adverse to valiance interest. Correct. And you have to dig down on that. What do they show to do that that is not undisclosed self-dealing? We know undisclosed dealing is short of the line of conviction and hence necessarily short of the line of overwhelming evidence of a conviction. You have to look, how did he act contrary to valiance interest? They relied on the negotiation email. They relied on diversification, one and two. They told the jury diversification alone was enough. The court has to hold the skilling line, insist on something more than just undisclosed self-dealing, and really focus on the government's evidence. And it is the government's burden to show harmlessness. I ask the court to reverse. Thank you very much. We'll reserve decision.